UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHANA CELESTINE JAMES,

                                     CASE NO. 15-11790

              *Plaintiff*,              DISTRICT JUDGE GERSHWIN A. DRAIN

*v.*                                  MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

             *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS
MOTIONS FOR SUMMARY JUDGMENT (Docs. 15, 16)**

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that James is not disabled. Accordingly, **IT IS RECOMMENDED** that James' Motion for Summary Judgment (Doc. 15) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for a period of disability, Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 *et seq*., and for Supplemental Security Income

("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 3; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 15, 16).

Plaintiff Shana James was twenty-six years old as of May 14, 2008, her date of alleged disability. (Tr. 13, 195). Her applications for benefits were initially denied on July 26, 2012. (Tr. 74-82). James requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Henry Perez, Jr. on October 13, 2013. (Tr. 25-51). James, represented by attorney Barry Keller, testified, as did vocational expert ("VE") Luann Castellana. (*Id.*). On November 27, 2013, the ALJ issued a written decision in which he found James not disabled. (Tr. 8-20). On March 16, 2015, the Appeals Council denied review. (Tr. 1-3). James filed for judicial review of that final decision on May 19, 2015. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

## C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . .

physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found James not disabled under the Act. (Tr. 20). The ALJ found at Step One that James had not engaged in substantial gainful activity following the alleged onset date, May 14, 2008. (Tr. 13). At Step Two, the ALJ concluded that James had the following severe impairments: "affective disorder; anxiety disorder; and substance abuse disorder." (*Id.*). At Step Three, the ALJ found that James' combination of impairments did not meet or equal one of the listed impairments. (Tr. 14-15). The ALJ then found that James had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, except with nonexertional limitations as follows: "Claimant is limited to simple, one-to two-step tasks on a routine regular basis at the unskilled level of work." (Tr. 15-18). At Step Four, the ALJ found that it could not be determined whether James had past relevant work, and thus proceeded to the next step. (Tr. 18-19). At Step Five, the ALJ concluded

that James retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 19-20).

### E.   Administrative Record

#### 1.   Medical Evidence

The Court has thoroughly reviewed James' medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.   Application Reports and Administrative Hearing

##### a.   James' Function Report

James completed a function report on July 25, 2012, in which she asserted that she suffered from "constant panick [sic] attacks when standing to [sic] long very difficult to consentrate [sic]. Exhausted from medication for depression." (Tr. 214). She also noted that she required "constent [sic] 15 minute breaks . . . because of panic attacks." (*Id*.). She alleged that she had "no motivation;" on an average day she would walk around her home to determine if she would experience a panic attack, would eat if she had an appetite, took breaks to lay down, and went to bed. (Tr. 215). She complained of staying awake for "days," racked with fears about her mortality. (*Id*.). As to personal care, she expressed little concern about appearance, bathed only weekly, and sometimes lacked an appetite. (*Id*.). As to meals, she prepared sandwiches, frozen dinners, and protein shakes daily. (Tr. 216). Nevertheless, she expressed feeling nausea on occasion when smelling food. (*Id*.). She washed dishes about twice monthly. (*Id*.).

6

As to going outside, James said only "not often, no hope." (Tr. 217). She did not shop in stores. (*Id.*). She got confused when counting change on occasion, but could otherwise handle money without issue. (Tr. 218). She enjoyed music on a daily basis. (*Id.*). She wrote that she did not spend time with others. (*Id.*). She infrequently needed reminders to go places. (*Id.*). She reported that she was "not social" and did not "want to be around people" because she "fe[lt] to [sic] depressed. (Tr. 219). She reported problems with lifting, squatting, bending, standing, reaching, stair climbing, memory, concentration, and getting along with others. (*Id.*). She also wrote that she had "no strength" because of her limited appetite, such that she could not lift fifty pounds; she got dizzy when standing, lifting, and reaching, and had difficulty with balance due to her medications. (*Id.*). She could walk about two blocks followed by a ten minute rest. (*Id.*). She had no concentration issues. (*Id.*). She got on well with authority figures, and had never been fired due to difficulty interacting with others. (Tr. 220). She handled stress poorly, resulting in trouble sleeping, eating, and panic attacks. (*Id.*). She handled changes in routine "not so well." (*Id.*). She also noted nightmares, and panic attacks inducing feelings that she might die. (*Id.*). She woke up hourly due to nightmares. (Tr. 221). Her use of Klonopin resulted in dizziness and fatigue. (*Id.*).

### b.    James' Testimony at the Administrative Hearing

At the October 17, 2013, hearing before the ALJ, James testified that she was then living with "a friend, or a lady who let me live in her basement for a while." (Tr. 28). She was last gainfully employed in 2010 as a temporary manufacturing worker; she was fired

7

because she experienced panic attacks including sweating and shortness of breath. (Tr. 29). She also worked as a dancer in clubs between 2010 and 2011, but again was terminated due to shortness of breath, fainting, and sweating resulting from panic attacks. (Tr. 30). She had an associate's degree in science, but was unable to obtain work as a lab tech due to lack of experience and panic attacks. (Tr. 31-32). She experienced alcohol dependence in the past, but overcame that dependency in 2010. (Tr. 32-33). Following the termination of an abusive relationship, James found herself homeless, sleeping in cars and abandoned houses. (Tr. 33).

James stated that her use of Klonopin "slow[ed] . . . down" her panic attacks, such that "sometimes . . . I'll have three a day instead of like ten." (Tr. 35). The ALJ noted that her prescription had increased over time from 15mg per day to 45mg. (*Id.*). James' panic attacks resulted in tingling to her extremities, sweating, and fainting spells. (Tr. 36). To relieve this stress, she would lay down; if she moved, she would "throw up and everything," her heart would race for twenty to twenty-five minutes at a time. (*Id.*). She reported that the husband of the woman with whom she was residing was flirtatious, and that his advances brought on panic attacks. (Tr. 37). Likewise, being in crowds of people and sleeping in cars could prompt panic attacks. (*Id.*). The ALJ noted that James was becoming sweaty during the hearing, apparently indicating the imminent onset of a panic attack resulting from pressure of the hearing. (*Id.*).

James stated that she was off task frequently during her time working on an assembly line due to panic attacks. (Tr. 37). She stated that her panic attacks sometimes

8

came "out of the blue," resulting in shortness of breath, episodes of sweating, and inability to continue working. (Tr. 37-38). She also expressed difficulty handling the pace of the work, which could also bring on panic attacks. (Tr. 38). When working as a dancer she sometimes "dance[d] to meet men to take care of [her]," such that she could access food and transportation. (Tr. 39).

James' heart began racing, but she declined the opportunity to take a break from the hearing. (Tr. 39-40). James asserted that she would be able to work but for her panic attacks. (Tr. 40). She experienced panic attacks three or four times daily, which lasted from five to twenty minutes. (*Id*.).

### c.      The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine James' ability to perform work. (Tr. 40). The ALJ asked a large number of questions attempting to establish the level of exertion required by James' prior jobs; given that the ALJ found in his decision that James had no past relevant work, these questions have no bearing on the outcome of the ALJ's decision. (Tr. 41-48). The ALJ asked the VE to assume a hypothetical individual with James' age, education, and work experience, and who had no exertional limitations, but who "can perform simple one-to two-step tasks on a routine, regular basis" at the unskilled level. (Tr. 48-49). The VE found that such a worker could perform work available in the national economy, including production assembler (150,000 jobs nationally), inspector (300,000 jobs), and housekeeper (130,000 jobs). The VE also stated that if James' testimony about experiencing three to four panic

attacks lasting as long as twenty minutes per day was accepted, that limitation would preclude full-time competitive work. (Tr. 50).

**F.    Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

10

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

11

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

12

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

13

> (v)    Treatment, other than medication, . . . received for relief of . . .
> pain;
> (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

James argues that the ALJ erred in the following ways: 1) Improperly focusing on her ability to perform non-work tasks; 2) Underemphasizing the importance of James' Global Assessment Functioning ("GAF") scores; 3) Wrongly impugning James' credibility; 4) Failing to consider whether James' mental impairments affected her

14

testimony; 5) Providing the VE with an incomplete hypothetical. (Doc. 15 at 4-8). These arguments will be addressed in turn.

### 1.      Waiver of Arguments

It is well settled that where a Social Security claimant makes arguments which are "adverted to in only a perfunctory manner," those arguments "are waived." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). *See also Aarti Hospitality, L.L.C. v. City of Grove City, Ohio*, 350 Fed. Appx. 1, 11 (6th Cir. 2009) ("After setting forth the applicable law on their due process claim, plaintiffs devote one sentence in their appellate brief to 'arguing' why the district court's judgment should be reversed . . . . Accordingly, we deem plaintiffs' appeal of their due process claim forfeited."); *Fielder v. Comm'r of Soc. Sec.*, No. 1310325, 2014 WL 1207865, at *2 (E.D. Mich. Mar. 24, 2014).

Here, several of James' arguments are fatally underdeveloped, and should be found waived. James asserts that the ALJ

> failed to include essential information which may have changed the opinions of the [VE]. In the present case, the record contained evidence that the Plaintiff had moderate restrictions and limitations because of her inability to concentrate and maintain attention to hedr [sic] tasks . . . . The [ALJ] must pose hypothetical questions which comprise of the claimant's impairments . . . . The [ALJ] provided incomplete Hypothetical questions to the [VE] . . . by failing to accurately include Plaintiff's non-exertional impairments.

(Doc. 15 at 8). The ALJ's hypothetical limited the worker to "simple one-to two-step tasks on a routine, regular basis" and at the "unskilled level." (Tr. 48). James does not elucidate how or why these limitations fail to account for her non-exertional limitations.

15

Perhaps James believed that the ALJ should have accounted for limitations to her ability to perform work at pace, but that is anyone's guess, as James made no such argument. Similarly, James might believe that the VE should have been asked whether suffering from one, two, or three panic attacks daily would preclude employment. She likewise failed to raise this argument, and it is waived.

Federal courts are not in the business of making arguments for parties, even where a litigant proceeds *pro se*. *See Kim v. Obama*, 615 F. App'x 516, 517 (10th Cir. 2015) ("[W]e won't act as [a *pro se* plaintiff's] advocate by formulating arguments or scouring the record on his behalf."). This is doubly true where a party proceeds with counsel, as James has in this matter. Thus, to whatever extent she believes that the ALJ erred by formulating an insufficiently representative hypothetical for the VE, James has waived that argument.

The Court also notes that James does not argue that the ALJ erred by finding that she did not qualify for a closed period of benefits. This argument is likewise waived.

### 2.    *The ALJ Properly Considered James' Activities of Daily Living*

James next argues that the ALJ erred by not "looking at the big picture" of her treatment record, but instead focusing on her ability to play Facebook games and complete crosswords. (Doc. 15 at 5). Yet the ALJ did not consider James' activities of daily living in a vacuum. An ALJ may consider activities of daily living in evaluating the claimant's claims of pain and ailments. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997).

16

Review of the ALJ's decision shows that he did not consider James' playing of Facebook games and crosswords to the exclusion of the remainder of her medical record, but rather holistically considered the record, including James' medical treatments, her testimony, and her medical treatments. The ALJ made note of James' medical record, including her pursuit of mental health treatment "[s]ince early 2008 . . . on a fairly regular basis." (Tr. 16). The ALJ found that, despite the consistency of her treatment, James' medical records undercut her allegation that she suffers from three to four twenty-minute panic attacks daily. (*Id*.). The ALJ noted that James told treating professionals that she had panic attacks only rarely in August 2011, only one per two months in October 2011, experienced two panic attacks daily in January 2012, one per day in May 2012, and rarely mentioned panic attacks throughout the latter portion of 2012. (Tr. 17, 40, 255-60, 335-66).

The ALJ likewise noted that James did not seek inpatient or emergency care, suggesting that her symptoms were not disabling.[1] (Tr. 17). This was proper, as a lack of hospitalization can indicate that mental issues are not particularly severe. *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 335 (6th Cir. 2007). The ALJ also specifically noted some of the findings made by James' physicians throughout her treatment history, including findings of normal eye contact, thought processes, mood, attention, memory,

---

[1] At least one record indicates that James had a "long history of psychiatric hospitalizations and treatment," but she did not actually experience hospitalization or emergency treatment for psychiatric issues for the period covered by the medical records she submitted. (Tr. 244).

17

psychomotor activity, speech, thought processes, thought content, impulse control, and judgment, alongside some findings of depressed mood. (Tr. 17).  This summary of the record presents an accurate picture of James' mental health, which indicated consistent issues with panic attacks, but also demonstrated that those attacks were infrequent (Tr. 260, 296-97), and that her psychological faculties, including logic, insight, and judgment, were fully intact (Tr. 305).

Likewise, James argues that the ALJ "failed to consider all of the relevant medical evidence," though she provides no additional support for this assertion. (Doc. 15 at 5). As noted above, the ALJ's decision includes a thorough recitation of the medical evidence, James' testimony, and her activities of daily living. The ALJ did not err here, either.

### 3.       *The ALJ Properly Considered James' GAF Scores*

James next notes that she was regularly found to have a GAF score of 55, produced throughout a "consistent course of treatment for her psychiatric conditions." (Doc. 15 at 5). She asserts that the GAF score is significant because it "goes to the issue of whether Plaintiff can work with others." (*Id.* at 6). "[A] GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning . . . A GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues." *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011) (quotation omitted). A GAF score of 51–60 "indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social,

occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 (6th Cir. 2006) (citing Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th Ed., Text Rev. 2000)).

James does not clearly assert any defect in the ALJ's evaluation of her GAF scores. To whatever extent she might accuse the ALJ of overlooking or overweighing these scores, I suggest the ALJ committed no error. (Tr. 18). Indeed, the ALJ's recitation of the GAF scores was more favorable to James than her own analysis, as he noted that her scores ranged from 49 to 60, and gave significant weight to the scores above 51, whereas James only notes that she received GAF scores of 55. (*Id.*). The ALJ appropriately considered James' GAF scores in conjunction with the other evidence of record.

### 4.    *The ALJ Properly Evaluated James' Credibility*

James next argues that the ALJ erred in evaluating her credibility. (Doc. 15 at 6). She incorrectly asserts that the ALJ "did not discuss the fact that the Plaintiff was homeless, had difficulties with her medication, and was required to increase the dosage on her Klonopin to assist her in dealing with her panic attacks." (*Id.*). However, the ALJ explicitly considered James' homelessness and the manner in which it might have impacted her activities of daily living, including her alleged mental functioning and hygiene. (Tr. 14-15). Likewise, the ALJ explicitly noted that she "has taken Klonopin in

increasing doses since 2008, which she said helps to slow down the panic attacks." (Tr. 16).

James also takes issue with the ALJ's finding that her medical records, indicating a relatively low amount of panic attacks per month, impugns the credibility of her allegation that she suffers from four such attacks daily. (Doc. 15 at 6). James asserts that "[t]he explanation is simple, the medication was just beginning to work. This explanation is a far better way of describing the Plaintiff's condition rather than stating that she was not fully credible." (*Id.*). If anything, this explanation weakens James' claim that she is disabled; James admits that Klonopin works to reduce the incidence of panic attacks, thus supporting the ALJ's conclusion that her testimony that she suffered four attacks per day was not fully credible.

### 5.    *The ALJ Properly Evaluated James' Testimony*

James next argues that the ALJ "should have considered that the Plaintiff has severe emotional impairments which would explain why her testimony at sometimes may be flawed." (Doc. 15 at 7). Precisely which flaw in her testimony James is referencing is again anyone's guess. No matter how one interprets James' testimony, the medical record simply does not support finding that she experiences four panic attacks daily.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that James' Motion for Summary Judgment (Doc. 15) be **DENIED**, the Commissioner's Motion (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection

21

No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 26, 2016                                S/ PATRICIA T. MORRIS
                                                   Patricia T. Morris
                                                   United States Magistrate Judge


## **CERTIFICATION**

    I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 26, 2016                                By s/Kristen Krawczyk
                                                  Case Manager